# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF VIRGINIA

# HARRISONBURG DIVISION

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

12/07/2025
LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

LISA RICHARDS,

     Plaintiff,

v.                            Civil Action No. __5:25cv00137__

BLOCK, INC.,               DEMAND FOR JURY TRIAL

     Defendant.

---

## COMPLAINT FOR RELIGIOUS DISCRIMINATION

TO THE HONORABLE COURT:

Plaintiff Lisa Richards, an attorney, brings this action against Defendant Block, Inc. for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and respectfully alleges as follows:

---

## I. NATURE OF THE ACTION

1.     This is an action for employment discrimination based on religion in violation of Title VII of the Civil Rights Act of 1964. Plaintiff seeks damages, injunctive relief, and attorney's fees resulting from Defendant's discriminatory refusal to interview or hire her for permanent employment based on her sincerely held Christian religious beliefs and association with her husband's biblical ministry.

---

## II. JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 2000e-5(f)(3) (Title VII jurisdiction).

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff performed work for Defendant while residing in this judicial district, working remotely from her home in Virginia within this District.

4.     Plaintiff has exhausted her administrative remedies by filing EEOC No. 570-2025-02187 with the Equal Employment Opportunity Commission and receiving a Notice of Right to Sue dated September 7, 2025.

5.     To the extent any agreement between the parties requires arbitration of disputes, Plaintiff reserves the right to pursue arbitration and brings this complaint in the alternative or to preserve her claims.

6.     Prior to filing, Plaintiff sent Defendant a demand letter and draft complaint on November 25, 2025, which included Plaintiff's complete name and identifying details regarding her husband's religious ministry work. Defendant acknowledged receipt through its employment counsel, Jerri Kay-Phillips. The parties engaged in confidential settlement discussions protected by Federal Rule of Evidence 408 but were unable to reach agreement.

_____

### III. PARTIES

7.     Plaintiff Lisa Richards is an individual residing in Virginia, within this judicial district. She is a licensed attorney in Virginia and New York with over fifteen years of legal experience, including more than ten years as a senior attorney at the Office of the Comptroller of the Currency.

8.    Defendant Block, Inc. is a Delaware corporation with its principal place of business at 1955 Broadway, Suite 600, Oakland, California 94612. Block employs more than 501 employees and is engaged in commerce within the meaning of Title VII.

_____

## IV. FACTUAL ALLEGATIONS

### A. Prior History Establishing Block's Pattern of Providing Feedback to Rejected Candidates

9.    Plaintiff had interviewed for positions at Block on previous occasions before her 2024 contractor engagement. When Plaintiff was not selected for a prior role, Block provided her with specific feedback explaining the decision.

10.    Specifically, Rich Dana, a Block employee, informed Plaintiff that she had not been selected because, during a practice assignment, she had made a comment about raising Block's stock price. Mr. Dana explained that the hiring manager believed Plaintiff should have been more mindful of not putting something like that in writing -- revealing Block's corporate culture of avoiding documentation of sensitive matters.

11.    This feedback is significant for two reasons: First, it establishes that Block has a practice of providing rejected candidates with substantive explanations for hiring decisions upon request -- a practice they completely abandoned when rejecting Plaintiff in January 2025. Second, it establishes that Block's corporate culture actively discourages creating paper trails regarding sensitive hiring matters, demonstrating an awareness that certain hiring decisions should not be documented.

12.    Block's departure from its prior practice of providing feedback -- combined with its documented culture of avoiding paper trails -- creates a strong inference that the reason for

refusing Plaintiff an interview in January 2025 was something Block knew could not be put in writing: religious discrimination and/or retaliation for opposing such discrimination.

**B. Plaintiff's Successful Contractor Performance**

13.    In April 2024, Defendant engaged Plaintiff as a contractor through Legal.io staffing agency to serve as Lending Regulatory Counsel supporting Block's Regulatory team on a variety of projects.

14.    Disparate Treatment Regarding Qualifications -- When Block was hiring for a different attorney role, several months before Plaintiff's 2024 contractor engagement began, Harry Kastenbaum at Block interviewed Plaintiff for a regulatory counsel position reporting to him. Plaintiff was not selected for that role. Naiema Blanchard later informed Plaintiff, sounding apologetic, that the reason Harry had not selected her previously and the selected candidate, Nika, was hired was because Nika had prior experience working with Block as outside counsel -- establishing that Block valued candidates with direct experience performing the type of work the role required. By January 2025, Plaintiff had acquired precisely that qualification: she had eight months of direct experience successfully performing regulatory counsel work for Block, with consistently positive feedback and increased responsibilities. Despite now possessing the exact qualification Block had previously required -- proven ability to perform the work through actual performance for Block --  and despite a promise for an interview, Plaintiff was refused even an interview for similar positions. This inconsistency strongly suggests that Block's refusal was not based on legitimate qualification concerns, but on an impermissible factor: Plaintiff's religious beliefs and support of her husband's religious ministry discovered through social media or generally online.

15.     When Plaintiff began her engagement, Naiema Blanchard (Lead Regulatory Counsel) mentioned that she had previously worked with another contractor, Alex Gershon, for up to two years, indicating that contractor positions could be long-term based on performance.

16.     Plaintiff's initial six-month contract from April 30, 2024 to October 29, 2024 was extended for an additional two months through December 27, 2024, demonstrating Defendant's satisfaction with her performance.

17.     Throughout her eight-month engagement, Plaintiff received consistently positive feedback from her supervisors, including Naiema Blanchard, the broader lending regulatory team, and Raymond Ramirez (Product Counsel whom Plaintiff supported in his role and had weekly meetings with).

18.     In December 2024, Naiema Blanchard specifically told Plaintiff that she was "very well respected" at Block, and that Ms. Blanchard and Harry Kastenbaum had discussed this fact. (Exhibit A - Plaintiff's EEOC Response)

19.     On December 26 or 27, 2024, Plaintiff's final days as a contractor, Naiema Blanchard informed Plaintiff that Raymond Ramirez had told her he was "very impressed" with Plaintiff's work. Ms. Blanchard appeared genuinely pleased and happy when sharing this feedback, consistent with the friendly working relationship that had developed between them. (Exhibit A)

20.     Raymond Ramirez was one of the key stakeholders Plaintiff would have been assisting in the permanent Lending Regulatory Counsel role for which she was promised an interview, making his positive assessment of her work particularly significant.

21.     The only constructive feedback Plaintiff received during her entire eight-month engagement was a suggestion from Naiema Blanchard about being "too consumer friendly"

when reviewing consumer complaints. After implementing this feedback, Plaintiff was given increased responsibility -- she was invited to run the consumer complaints review for the entirety of Cash App, a responsibility she maintained until her departure. (Exhibit A)

22.    During her engagement, Plaintiff demonstrated her legal skills by identifying and correcting errors in the work of permanent employees, including Maya Parekh, and finding legal issues that others had missed.

23.    In their response to Plaintiff's EEOC charge, Legal.io -- Plaintiff's staffing agency -- who was involved with both Plaintiff's initial placement at Block, and her two-month extension -- stated that they "promoted Ms. Richards' candidacy internally" and acknowledged her specialized qualifications in their "competitive" legal staffing market. Legal.io's positive assessment came exclusively from their knowledge of Plaintiff's work at Block, and they reported receiving no negative feedback about Plaintiff's performance. (Exhibit B - Legal.io EEOC Response)

24.    Multiple Block attorneys Plaintiff had worked with at Block, actively assisted Plaintiff in seeking new employment opportunities in December 2024, behavior entirely inconsistent with any performance concerns:

   a.    On December 10, 2024, Maya Parekh, a Block attorney on Naiema Blanchard's team, reached out to her professional network to help Plaintiff find employment, responding "My pleasure!!" when thanked. (Embedded Exhibit C)

   b.    On December 13, 2024, Nicole Clarke, another Block attorney on Naiema Blanchard's team, sent an email to a recruiter describing Plaintiff as "an exceptional candidate" who "far exceeds the minimum requirements and qualifications" and has "a robust regulatory background and a proven track record for success in the fintech sector." (Embedded Exhibit B)

c.      On December 17, 2024, Seyi Iwarere, Payments Regulatory Counsel at Block, sent Plaintiff presentation materials to assist with her interview preparation at other companies, concluding with "Best wishes on your interviews! Please feel free to let me know if I can be helpful further." (Embedded Exhibit D)

d.      In late December 2024, Alyson Danner, a Block manager, specifically encouraged Plaintiff to apply for other open roles at Block.

25.     Naiema Blanchard had previously told others on the team that she liked Plaintiff and appreciated her work, said that Plaintiff was doing "such a great job". She expressed that she was sorry Plaintiff was leaving. She also provided Plaintiff a recommended contact she knew who was hiring for a permanent role (Embedded Exhibit A)

**C. Promise of Permanent Employment Interview and Contract Non-Renewal Explanation**

26.     During Plaintiff's final weeks of employment, Naiema Blanchard expressed genuine regret, explaining that she had really tried to get Plaintiff an extension of her contract but that Block could not extend Plaintiff's contract for a third time, explaining that the company had overhired in licensing due to not expecting a Trump electoral victory, which had resulted in reduced federal government enforcement activities (specifically at the CFPB). Ms. Blanchard appeared visibly sorry and disappointed when delivering this news.

27.     Notably, Ms. Blanchard's explanation for the contract non-extension was entirely business-related: the company had overhired due to not expecting a Trump electoral victory, which resulted in reduced federal enforcement activity. Ms. Blanchard appeared visibly sorry and disappointed when delivering this news, and at no point suggested the non-extension was related to Plaintiff's performance.

28.     On December 17, 2024, during a Google Meet video call, Naiema Blanchard explicitly guaranteed Plaintiff an interview for the permanent Lending Regulatory Counsel position that would report to Ms. Blanchard. Plaintiff and Ms. Blanchard also discussed the interview over Slack. These communications are preserved in Defendant's records and will corroborate this promise.

29.     On that same day, December 17, 2024, Plaintiff mentioned Ms. Blanchard's promise of an interview to Maya Parekh during a video call. Ms. Parekh can verify that Plaintiff contemporaneously reported receiving this promise.

30.     Ms. Blanchard also sent Plaintiff a Slack message in late December 2024 specifically notifying her when the Lending Regulatory Counsel position was posted, further demonstrating her intent to interview Plaintiff for the role. This Slack message is preserved in Defendant's records.

31.     Plaintiff also expressed interest to Harry Kastenbaum via Slack about applying for the Regulatory Counsel – Square Financial Services position that reported to him. Mr. Kastenbaum responded positively to this inquiry in Slack communications -- which occurred after Plaintiff had been working with the team for seven to eight months and he was fully familiar with her work. When Plaintiff first met Mr. Kastenbaum at the beginning of her engagement, he remembered her warmly from prior interviews and greeted her via Slack with "Well hello." These Slack messages would be discoverable.

32.     Plaintiff reasonably relied on these communications and expected to receive interviews for these positions in early January 2025.

**D. Abrupt Change in Treatment and Total Communication Blackout**

33.     Following the completion of Plaintiff's contract on December 27, 2024, and Plaintiff's protected opposition to discrimination in early January 2025, Defendant's treatment of Plaintiff changed dramatically, culminating in complete communication cutoff and without any explanation.

34.     Despite the explicit promise of an interview, Defendant failed to contact Plaintiff about any interview scheduling or next steps.

35.     On January 8, 2025, Plaintiff sent a LinkedIn message to Leanne Tomas, a Block recruiter, following up on her applications and stating: "I understand Naiema and Harry wanted me to be interviewed. Can you please make sure I receive an interview for those roles as well as potentially some of the others I applied for?" (Embedded Exhibit A)

36.     On January 9, 2025, Plaintiff sent an email to Leanne Tomas following up on "various roles I applied for" and specifically stating: "I was told I would be receiving interviews for Naiema and Harry's posts." (Embedded Exhibit A)

37.     On January 10, 2025, Plaintiff sent a LinkedIn message to Naiema Blanchard stating she had not heard from Leanne about setting up an interview for the lending regulatory counsel role. (Embedded Exhibit A)

38.     On January 13, 2025, Plaintiff sent an email directly to Naiema Blanchard with the subject line "Interview for lend reg position," stating: "You told me you guaranteed you would interview me for the role yet no one has set this up. If perhaps this has something to do with a social media profile, please note that I have deactivated my account. (There is some lag time before a deactivated account gets fully removed online so it may still appear until they complete the deletion on their end). Can you please let me know what's going on here? Or simply have someone contact me to schedule an interview." (Embedded Exhibit A)

39.     Plaintiff's January 13, 2025 email constituted protected opposition to discrimination

under Title VII. By suggesting that the silence might relate to her social media profile (which

significantly reflected her religious beliefs and support of her husband's biblical ministry),

Plaintiff was opposing what she reasonably believed to be religious discrimination. This

protected activity triggered immediate and severe retaliation from Defendant.

40.     Ms. Blanchard never responded to Plaintiff's January 13, 2025 email explicitly

referencing social media. This email directly raised the issue of social media as a potential

cause for the silence, yet Block chose not to deny this connection.

41.     On January 14, 2025, Leanne Tomas sent an email responding to Plaintiff's inquiry,

stating she was conducting "recruiter screens this week" for Naiema's role and would "follow

up with [Harry's team] later this week," promising to have "news from them before the

weekend." Ms. Tomas deliberately ignored Plaintiff's January 13 and January 14 references

to social media discrimination, responding to other parts of Plaintiff's emails while avoiding

this specific issue. Despite promising updates "before the weekend" (January 17-18, 2025),

Ms. Tomas never contacted Plaintiff again. After this email, all communication from Block --

including from Ms. Tomas -- ceased completely, despite Plaintiff's follow-up emails on

January 23, 2025 and January 27, 2025. (Embedded Exhibit A)

42.     In Block's EEOC response, Block claimed Ms. Tomas "did not understand" Plaintiff's

social media reference. This explanation lacks credibility for multiple reasons: First, if Ms.

Tomas genuinely did not understand the reference, the natural professional response would

have been to ask for clarification or state that there was no issue with her social media

account, particularly given that she was actively responding to other parts of Plaintiff's email.

Instead, she ignored the social media references entirely while responding substantively to

other inquiries. Second, Ms. Tomas promised updates "before the weekend" but never

delivered, suggesting the issue was not confusion but deliberate avoidance. Third, Block's EEOC response fabricated performance concerns that were never communicated to Plaintiff during her eight-month engagement, never mentioned to Legal.io (her staffing agency), and directly contradicted by the contemporaneous written statements of Block's own employees describing Plaintiff as an "exceptional candidate" who "far exceeds the minimum requirements and qualifications" (Embedded Exhibit B), as well as Naiema Blanchard's contemporaneous oral statements to Plaintiff that she was "very well respected" at Block and that Raymond Ramirez was "very impressed" with her work. This post-hoc invention of performance issues -- rather than simply stating positions were filled or that Plaintiff was not selected -- demonstrates pretext and shows Block was scrambling to justify conduct it knew was discriminatory. Fourth, Block's claim that they never check social media when hiring for permanent positions seems unlikely for a public company in a heavily regulated industry hiring for compliance and regulatory positions. Standard hiring practice for permanent employment in most companies includes social media review. Moreover, even if Block did not view Plaintiff's specific social media posts prior to Plaintiff's January 13 email, Plaintiff has a readily discoverable online presence reflecting her involvement in her husband's biblical ministry. A basic internet search of Plaintiff's complete unique name -- standard practice in permanent hiring -- would have revealed this religious content.

43.    Following Ms. Tomas's January 14, 2025 email, Plaintiff sent follow-up emails on January 23, 2025 and January 27, 2025, seeking the promised updates. Defendant never responded to either email, despite Ms. Tomas's specific promise to provide news "before the weekend" of January 17-18. This complete communication blackout following Plaintiff's protected opposition to discrimination constitutes unlawful retaliation.

44.    In stark contrast to Block's prior practice of providing detailed feedback to rejected candidates -- as demonstrated by Rich Dana's explanation for Plaintiff's prior rejection --

Block has refused to provide any explanation for reneging on the promised interview in

January 2025, despite Plaintiff's multiple direct inquiries. This departure from Block's

established practice strongly suggests that the true reason cannot be put in writing because it

would violate federal anti-discrimination laws.

**E. Complete Communication Blackout Following Protected Opposition**

45.    The temporal proximity between Plaintiff's protected opposition (January 13 email to

Naiema and January 14 email to Leanne referencing potential social media discrimination)

and Defendant's complete communication cutoff is immediate and undeniable. Before

Plaintiff's opposition, Defendant's employee responded to Plaintiff's inquiries, albeit slowly.

After Plaintiff's opposition, zero communication occurred despite multiple follow-up

attempts and despite Ms. Tomas's specific promise to provide updates. This dramatic change

in conduct immediately following protected opposition establishes retaliation.

46.    The intensification of Defendant's avoidance after Plaintiff's protected opposition

demonstrates retaliatory animus. Defendant's refusal to provide any response -- even a simple

"we've decided not to move forward" -- shows Defendant could not respond without either

admitting the discrimination or creating a paper trail of pretextual explanations. The complete

silence itself is the retaliation.

**F. Evidence of Deliberate Avoidance and Consciousness of Wrongdoing**

47.    When Plaintiff's contract ended on December 27, 2024, she initially waited to return

her company-issued laptop because she reasonably expected to return to Block for the

promised interview and likely permanent employment. Once it became clear in early

February 2025 that Block was refusing all communication, Plaintiff promptly sought to return the equipment to honor her contractual obligations and comply with Block's offboarding procedures, which specifically required returning equipment directly to Block -- not through Legal.io. Defendant refused to communicate with Plaintiff directly about even this basic administrative matter, seemingly to comply with internal directives to avoid any paper trail with Plaintiff.

48.    On February 3, 2025, Plaintiff sent an email to both Naiema Blanchard and Leanne Tomas with the subject line "Laptop return process and follow up," requesting instructions for returning the laptop directly to Block as required by Block's procedures, and asking about "potential permanent positions at Block." Neither responded. (Embedded Exhibit A)

49.    On February 10, 2025, Plaintiff followed up again with Naiema Blanchard and Leanne Tomas about the laptop return. Again, neither responded.

50.    Only after Block refused to respond to two direct requests did Plaintiff contact Bailie Hurst at Legal.io on or about February 25, 2025, despite this being contrary to Block's own stated offboarding procedures requiring direct return to Block.

51.    On February 28, 2025, Bailie Hurst at Legal.io forwarded Plaintiff an email from Jelena Kutlesa at Block regarding laptop return procedures. Critically, the email from Block was addressed "Hi Lisa" but had been sent only to Bailie Hurst at Legal.io -- not to Plaintiff. Ms. Hurst specifically noted: "I wanted to make sure your [sic] received it" -- confirming that Block was deliberately communicating about Plaintiff while refusing to contact her directly. This violated Block's own offboarding procedures, which required direct communication with the departing contractor. Given Block's documented corporate culture of avoiding paper trails on sensitive matters (as shown by the Rich Dana feedback), Block's bizarre refusal to contact Plaintiff directly -- even to retrieve their own property -- shows consciousness of wrongdoing

and a deliberate strategy to avoid documenting their discriminatory motivation. (Embedded

Exhibit G)

**G. Religious Beliefs and Social Media Presence**

52.     Plaintiff is a devout Christian who holds traditional biblical beliefs.

53.     Plaintiff actively supports her husband's biblical ministry through social media. Her

husband is a biblical Greek scholar with over twenty-eight years of experience studying the

bible, including the Septuagint, and who has operated a main website for his ministry for over

25 years and has other related online projects.

54.     Plaintiff's X (formerly Twitter) account, @BelieveYeshua, uses her full legal name

(not stated herein) -- a unique name that is easily searchable -- along with her photograph.

The profile identified her as an "Ivy League educated lawyer (Columbia College '99, NYU

School of Law 2010 -- turned down Harvard Law in 1999). Jewish but I read and study Old

and New Testament." (Embedded Exhibit H - Screenshot of X Profile). Similar information is

also available through internet searches.

55.     Standard hiring practice for permanent employment positions includes review of

candidates' social media and online presence. Given that Plaintiff was being considered for

permanent employment, Defendant would have conducted such a review during late

December 2024 or early January 2025. A simple Google search of Plaintiff's unique name

would immediately reveal her religious social media presence and involvement in her

husband's biblical ministry.

56.     The timing of Defendant's dramatic change in treatment -- from positive feedback,

genuine expressions of regret about contract ending, interview promises, Slack notifications

about job postings, and colleague recommendations to complete and total communication

shutdown -- correlates directly with when Defendant would have conducted standard background review for permanent employment consideration.

**G. Pattern Establishing Religious Discrimination**

57.    The sequence of events establishes a clear pattern: consistently positive performance feedback → contract extension → explanation that non-renewal was solely due to overhiring (not performance) → explicit interview promise → Slack notification of job posting → positive response from second hiring manager → colleagues actively helping with job search → discovery of religious content through standard background review → complete and total silence → refusal to explain why → routing of even laptop communications through third party to avoid contact.

58.    No legitimate business reason exists for Defendant's refusal to communicate basic information about hiring decisions to a recent contractor who had received uniformly positive feedback, whose colleagues called her "exceptional" and "very well respected," whose staffing agency confirmed receiving no negative feedback and "promoted her candidacy internally," and who had been explicitly promised an interview by the hiring manager.

59.    Defendant's coordinated silence with Legal.io, routing of communications through third parties, refusal to explain the broken interview promise, extreme avoidance of direct contact even for routine matters, and departure from its prior practice of providing feedback to candidates who were not selected, all display consciousness of discriminatory conduct.

60.    Plaintiff's explicit reference to social media in her January 13, 2025 email -- followed by complete silence from all Block personnel and no denial of that connection -- further supports the inference that Defendant discovered Plaintiff's religious expression and made a decision to exclude her from employment opportunities for that reason.

61.    The complete inexplicability of Defendant's behavior -- given that at-will employment

discrimination based on religion is illegal -- itself supports an inference of unlawful

discrimination, as there is simply no other explanation for the conduct.

_____

## V. CAUSES OF ACTION

### COUNT I: RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII

62.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

63.    Title VII prohibits employers from discriminating against individuals because of their

religion, including their religious beliefs, association with the religious beliefs of others,

observances, and practices. 42 U.S.C. § 2000e-2.

64.    Defendant's refusal to interview and hire Plaintiff for permanent employment was

based on her sincerely held Christian religious beliefs as expressed through her online

support of her husband's biblical ministry work.

65.    Plaintiff was qualified for the positions for which she applied, as evidenced by her

resume/qualifications and successful eight-month contractor performance, consistently

positive supervisor feedback, explicit promise of an interview, colleagues' descriptions of her

as "exceptional" and "very well respected," Legal.io's acknowledgment that they "promoted"

her candidacy and received no negative feedback about her work, and the fact that she was

given increased responsibility (running Cash App consumer complaints review) during her

engagement.

66.    Defendant treated Plaintiff differently than similarly situated individuals who do not

share her religious beliefs/association with her husband's religious beliefs, evidenced by the

dramatic and unexplained change from enthusiastic support to complete communication shutdown.

67.     The temporal proximity between Defendant's likely discovery of Plaintiff's religious social media content and the sudden change in treatment, combined with the complete absence of any legitimate explanation despite direct inquiry, establishes a causal connection between her religious beliefs and Defendant's discriminatory conduct.

68.     As a direct and proximate result of Defendant's religious discrimination, Plaintiff has suffered damages including lost wages, benefits, employment opportunities, and emotional distress.

## COUNT II: RETALIATION IN VIOLATION OF TITLE VII

69.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

70.     Title VII prohibits retaliation against individuals who oppose practices made unlawful by Title VII. 42 U.S.C. § 2000e-3(a).

71.     Plaintiff engaged in protected opposition activity when she sent emails on January 13, 2025 and January 14, 2025 suggesting that Defendant's failure to schedule her promised interview might be related to her social media profile, which reflected her religious beliefs and support of her husband's biblical ministry.

72.     Plaintiff's opposition was reasonable. Given the dramatic change from interview promise and positive feedback to complete silence, combined with the timing correlating to when Defendant would conduct social media/online review for permanent employment consideration, Plaintiff had a reasonable good-faith belief that Defendant was discriminating based on religion.

73.    Immediately following Plaintiff's protected opposition, Defendant took adverse action
against Plaintiff by completely ceasing all communication, despite promises to provide
updates. This included: (a) Ms. Tomas's failure to provide promised updates "before the
weekend" of January 17-18, 2025; (b) complete non-response to Plaintiff's follow-up emails
on January 23 and January 27, 2025; (c) refusal to communicate even regarding basic
administrative matters such as laptop return; and (d) routing of all subsequent
communications through Legal.io to avoid direct contact with Plaintiff.

74.    The temporal proximity between Plaintiff's protected opposition and Defendant's
adverse action is immediate and establishes causation. The complete communication blackout
began immediately after Plaintiff's January 13 and January 14 emails opposing
discrimination.

75.    Defendant's retaliatory conduct was severe and continued throughout Plaintiff's
attempts to resolve the matter. Even when Plaintiff sought to return company property as
required by her contractual obligations, Defendant refused direct communication, instead
routing messages through Legal.io. This extreme avoidance demonstrates that Defendant's
conduct was not mere business decision-making but retaliatory punishment for Plaintiff's
protected opposition.

76.    Defendant has offered no legitimate, non-retaliatory explanation for the complete
communication cutoff. Defendant's EEOC position that Ms. Tomas "did not understand"
Plaintiff's social media reference is not credible, as evidenced by: (a) Ms. Tomas's failure to
ask for clarification despite responding to other parts of the emails; (b) Defendant's specific
focus on social media in their EEOC defense, proving they understood the reference; and (c)
the promise of updates followed by permanent silence.

77.    As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered

damages including intensified emotional distress from being completely shut out of

professional communication, loss of the opportunity to interview for positions, inability to

obtain basic professional courtesy or explanation, and damage to her professional

relationships.

_____

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Issue a declaratory judgment that Defendant's conduct violated Title VII;

B.    Issue a permanent injunction requiring Defendant to cease its discriminatory

practices;

C.    Award Plaintiff compensatory damages for lost wages, benefits, and other economic

losses;

D.    Award Plaintiff damages for emotional pain, suffering, inconvenience, and loss of

enjoyment of life;

E.    Award Plaintiff punitive damages to deter future discriminatory conduct;

F.    Award Plaintiff enhanced compensatory and punitive damages for Defendant's

retaliatory conduct, which demonstrates malice and reckless indifference to Plaintiff's

federally protected rights;

G.    Award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-

5(k);

H.    Award such other relief as this Court deems just and proper.

_____

## VII. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully submitted,


/s/ Lisa Richards

Lisa Richards, Esq.

Virginia State Bar No. 96671

11166 Fairfax Blvd.

Suite 500 #1344

Fairfax, VA 22030

Tel: (202) 981-2059

Email: LWR2357@pm.me

*Attorney for Plaintiff*


_____

## EXHIBIT LIST

Exhibit A:     Plaintiff's Response to Block's EEOC Position Statement

> Embedded Exhibit A: Email correspondence with Leanne Tomas and Naiema Blanchard (January 2025); LinkedIn messages to and from Leanne Tomas and Naiema Blanchard (January 2025)

> Embedded Exhibit B: Nicole Clarke email recommending Plaintiff as "exceptional candidate" (December 13, 2024)

> Embedded Exhibit C: Maya Parekh email correspondence (December 10, 2024)

> Embedded Exhibit D: Seyi Iwarere email offering interview assistance (December 17, 2024)

> Embedded Exhibit G: Bailie Hurst forwarded email from Block re laptop return (February 28, 2025)

> Embedded Exhibit H: Screenshot of Plaintiff's X (Twitter) profile

Exhibit B:     Legal.io's EEOC Position Statement (confirming no negative feedback and promotion of candidacy)

Exhibit C:     Email to Naiema Blanchard and Leanne Tomas re laptop return (February 3, 2025, February 10, 2025)

Exhibit D:     EEOC Notice of Right to Sue (September 7, 2025)